I see the attorneys are present so if the attorney for appellant would make his appearance and then proceed please thank you Robert Sykes for the appellant I also have with me co-counsel Peter Sorensen let's see he's I can't see him but he's there Please proceed okay thank you to please the court first of all thank you for rescheduling this I know it was postponed about a month ago and not making us wait three or four months do appreciate that very much your honors I have I've practiced law in Utah for now 50 years I'm going to my 51st year and I've had many jury trials here in federal court state court and many civil rights cases okay and a lot of these cases have video not all but many of them do have some have more than others but I've never had a case yet where the video is so complete as it is in this case I think the video shows here about 98% of what's important what you don't see in the video is a middle-aged hotel owner who gets a call at 140 in the morning who's never been arrested and spent the whole day cooking for a funeral of one of her relatives who's exhausted you don't see that but what you what you do see is an empty locked hotel lobby at 140 in the morning with zero members of the public there you see a broken door that's been kicked in by a guest there's no crime alleged and no crime shown by Danielle this is a citizen assist call to get a locked out guest back into his hotel room you see an arrestee who's committed no crime never committed a crime has no weapon makes no threats makes no aggressive moves is not escaping and the key facts regarding the resisting claim and the excessive force claim occur in 52 seconds all very well shown by officer Carlson by camera Did Mr. Brangham commit a crime? Pardon me? Did Mr. Brangham commit a crime? Well, he yes, he kicked in a door. These were sliding doors and he kicked it sideways so he could get in even though there was a phone three feet to his left where he could have called from the from the breezeway. Mr. Mr. Mr. Brangham did commit a crime. Mr. Sykes, I understand, as you indicate, a lot of the information here is shown on the video. Yeah, but ultimately, for for I think our purposes, we need to put those facts in the context of the framework of qualified immunity and one issue that arises, I think, for you in that context is the question of whether even if there were a constitutional violation, there would that violation would be a constitutional violation. And I think that that violation was clearly established law in 2020 when these events occurred. And so I'm sort of struggling on both claims that you have both the unlawful seizure and the excessive force to find a basis for clearly established law in this situation. As I understand it, for your excessive force claim, you were relying principally, or at least in significant part on Graham itself. And and at least we have case law that suggests that's somewhat problematic. So do I understand correctly? You are relying on Graham for your excessive force claim? Yes, your honor, I think that what you see here with these facts on the on the excessive force claim, you have a situation where a person has committed no crime is in their own hotel room. And I think that's clearly obvious. You know, you had this case that I think might be helpful. I can find it here real quickly now. Love versus Grasshorn, a 2025 10th Circuit case, very well written. And what you say there, and I had known 11, but a factually similar case isn't always required. Now, that's the mistake I think that Judge Nuvru, who's a very good judge, made. He wanted us to show factually similar cases on something that had obvious clarity. Well, I'm sure Judge Backrek would appreciate the fact that you think Love is well written, but I don't know whether you don't have to have a directly on point case. But you do have to. It does have to be a situation that the facts here are so obviously indicative of a violation of the law. And in this case, the excessive force aspect, and I looked at the video and there are aspects of the video that are quite disturbing, actually. But that doesn't necessarily speak to the question of whether in this fact-intensive area of the Fourth Amendment that the officers would have been unnoticed that they committed a crime. I mean, they committed an unlawful act. Let me change that. They didn't know at the time, did they, about what she was doing all night, or they didn't know about what her status was as not having committed an offense, right? They didn't know any of that. Sure they did. Your Honor, they knew that she walked down that hallway for 52 seconds with a telephone in her hand. Telephone. I said they did not know anything about those circumstances you alluded to about what she was doing upstairs, right?  But I would cite you, Cortez v. McCauley, which I think you were on that case, Your Honor. We all were. It was on Bonk. On Bonk, okay. But, you know, they went and got Mrs. Cortez, I guess it was, out of the bedroom and marched her out to a police car, and this court said, you know, there was no need to use any force on her, you know. And here you've got a hotel owner, and I admit she's upset because her expensive door has been kicked in, you know. But she makes no aggressive move. Now, I think that there's obvious clarity that they can't use force on that woman. So is that your position? Is it your position that any force whatsoever is excessive when the person against whom the force is used has not committed a crime and isn't suspected of committing a crime at that point? In this case, yes, Your Honor. I don't think any force at all was justified on her because she hadn't done anything wrong. And by the way, you'll notice in the video, and the pictures are in our brief, she's pointing at him, Brangham, and they're about four or five feet apart, and she's not attacking him, you know. And so there's no need to use force at all. Any force here, like Cortez v. McConnelly, is excessive. Because there's no need to use it in this case, you know. Now, if she had been threatening him, maybe different. If she had attacked him, different. But she didn't do that, see. And so, and then I want to address the resisting for just a minute. You know, there is, when you look at our brief and the pictures we had in our brief, there is really no resisting here. At least it's a matter for a jury to determine, okay. They have control of her right hand, and her left hand is, she's pushed against the wall. When she walked down and was talking to the officer, and she complied, went in the back hallway, was talking to him, she says, I have procedures. Started to walk out to her front desk, and he chest bumped her. And then he grabbed her in the left, the left breast, and pushed her against the wall. We show that in there, okay. And she's terrified. Mr. Sykes, on the resisting arrest is part of an unlawful seizure claim, right? Yes. Okay. There are two specific theories under which they could have lawfully seized her. At least two specific theories are at play here. The resisting arrest and the disorderly conduct. So you have to basically convince us that neither one of those theories would be applicable. Is that not correct?   And so under the circumstances here, you're speaking of the resisting arrest. Well, if they, what about the statute? And pointing me to the statute, what about the statute do you think reflects the fact that there was a constitutional violation? But more to the point, and let me focus on this point. More to the point, what is the clearly established law that would allow them to know that they were violating her constitutional rights? Okay. On the disorderly conduct, we have very clear statutes and case law in Utah that talk about what a public place is. This was a locked hotel lobby. After hours. Small hotel, 40 rooms. Locked hotel lobby.  And we argued that in the brief, I think, very effectively. Also, there's a U.S. Supreme Court case. It says just because something may be public at one time, what's the name of that case again? Lloyd. Lloyd case. That may be public at one time doesn't make it public all the time. I thought the district court itself acknowledged that the law was not entirely clear in this area. Did it not? As it relates to public place? It held that it, no. The district court held, and this is not appealed, that this was not a public place, but it held that it wasn't clearly established on that. Well, that's, well, okay. Well, that's what I'm asking you. If the law is not clearly established that it was a public place, then how would the officers have been violating clearly established law in the context of the disorderly conduct theory? The district court held erroneously that the law wasn't clearly established. We think it was clearly established based upon the statutes and the case law. It was clearly established that this was not a public place at that hour of the morning. What is your best case that the law was clearly established that on the public place aspect of this? Well, I think, Your Honor, I cited a number of them. If you look at page 35 of our brief, okay, I would say the best one is the Gallegos case, or Gallegos case, that talks about a clubhouse and apartment building may be, quote, a public place during the day at 4 o'clock in the morning that takes on a different character. Now, there are other cases we cite there. And, you know, I think that the Lloyd case on page 37, property does not lose, it's a U.S. Supreme Court case, does not lose its private character merely because the public is generally invited to use it for designated purposes. And so I think those are two very good cases. And I think Judge Newford made an error there. Let me ask you, backing up just a little bit, when did the seizure first occur? It occurred 52 seconds after he saw her walking down the hall, when he chest bumped her, grabbed her breast and pushed her into the wall. So before the handcuffing? Yes, oh, yeah, yeah. And by the way, he never told her she was under arrest for 12 seconds. 12 seconds. So, oh, yeah, well, someone's telling me the Casey case, that's one of your cases. But I'd like to save my last minute and a half, if I could, for rebuttal. You may. Thank you. Counsel, please. Thank you. Good morning. And my name is Gregory Houle. I'm on behalf of the appellees today. May it please the court. When I was a JAG officer in the United States Navy, I had the opportunity to hear Justice Scalia. And he said the only time you know you're not wasting your breath in an oral argument is when you're answering a question. So I invite any questions the panel has from the outset. But I do think context here, especially in regard to qualified immunity, is key. Context is key. And if it's all right, I think I want to just review just real briefly the events of that morning. To put things into context. To help understand, you know, what was happening here. And why it really differs from any case that has been reported. And certainly any case that a plaintiff has cited in their briefs. Here's a question, right off the bat, since you're inviting them. Yeah. Did Mr. Brigham commit a crime by kicking the door in? No, he did not. Would he have committed a crime if he'd have kicked the police department door open or your law office door open? Yes. What's the difference? The difference is he had a legal right to be in the hotel. He was a hotel guest. He had a legal right to be in the hotel. He didn't do any damage to the door. The door swung open on its hinges and was able to be put right back on its track later that morning. No damage. Yeah, but what I couldn't tell from the video is the door had been locked. And after it was put back on its track, the officer waved his arm and it opened. I don't know if the lock got broken, which would kind of make sense that it would. To have that kind of force against it. That I don't know, Your Honor. But I don't believe he committed a crime. What if he broke the lock? Would that be a crime? Pardon me? What if he broke the lock? If he broke the lock, I don't know if there's an intent element in that crime, Your Honor. But he certainly was not intending to cause damage. He was intending to regain access to a hotel where he was a guest. But I'm not sure, Your Honor, how that plays into any of the issues before the court today with respect to qualified immunity. The police officers who arrived on the scene were not assessing that they arrived for one purpose and one purpose only. To assist a guest who was trying to get back into his hotel room. They really didn't know anything else going on at that moment. Their purpose was just to assist a guest. They contacted the owner of the hotel. A person who identified herself as the owner of the hotel. Who immediately flew into a rage. She was supposed to have been manning the lobby front desk. The lobbies open 24 hours a day for business. That's an undisputed fact. It's undisputed she was supposed to be there. But she was instead upstairs in a room with her husband. And was later determined by the officers and the sheriff deputy. Everyone who interacted with her to be intoxicated. Was her PHD ever taken? No. These were just based on the smell of her breath and her volatile actions. That goes so far. Which is to say that she took a pretty good shove. About four backpedals and remained on her feet. Yes, she did. She was coherent as far as what she was saying. Which was reasonable. This man just kicked my door in. Have him taken out of my hotel. Which I think there's a Utah statute on that.  What we know your honor. Whether or not she was intoxicated. She flew into a rage the moment the police interrupted her upstairs. I don't know about that. Because she just disregarded them. And wondered if they were really police and so forth. When she came downstairs. Is when the guest as you call him. Said that he kicked in the door. That's when she came downstairs. And you might understand how that might upset someone. Absolutely. And she was upset from the get go. As soon as she was cussing at the police officers. The police officers were remaining calm on the phone. Asking her to calm down. When she came into the lobby. Your honor. The police officers purpose changed from helping the guest. To doing one thing. And that was maintaining a safe distance. Between Ms. Blackmore. Who was clearly visibly upset. And maybe justifiably so your honor. But very upset. And trying to maintain safe distance. Between her and this guest. At whom she was very upset. The problem arose. When Ms. Blackmore refused to comply. With multiple requests of the police officers. To maintain that distance. To stop. To slow down. And each time there was a request. She responded with no. No, no, no. Well now things are jumbled. Because my recollection of the video. Is that she comes into the lobby area. Where Mr. Brangham is. As Mr. Sykes says. They were standing within arm length of each other. And there was not a confrontation. Then she is insisting. Remove this man from my hotel. Look what he's done to my property. And the officer. Carlson then says. Let's go back here. To talk to her. Because she's too close. There wasn't a confrontation at the moment. But police officers are trained to avoid confrontations. Is that the purpose then? Is that why he took her separate place? He wasn't investigating a crime. He took her to create distance. And then he wanted. How about the second part of my question though. He didn't take her away. Because he was investigating a crime. That she might have committed. No, not at that moment. It wasn't until she refused.  Frankly she had already refused. Multiple orders. Like what? It wasn't until she refused. Like what? To stop. And to go into the hallway. She says no. She says no twice. To go into the hallway. Finally she relents. She relents and goes in the hallway. But then immediately turns. And comes back. After she had been ordered to go in the hallway. The police are trying to get control of the situation. The word the officer used was let. It wasn't I order you. I direct you. It wasn't like that. The police were being very polite. They were trying to get control of the situation. So they could actually listen to her. To understand what was going on. They very well could have helped her. Had she just slowed down. And talked to the police. Instead of being confrontational. If she had just stayed in the hallway. And talked to the police. And told them what was going on. We would not be here today. What was going on? The guest had broken her door. That was explained. The guest admitted it. What was she supposed to calmly tell them. That the police hadn't already been told. This was a rapidly evolving situation. How much of what she had said. In the midst of the police trying to avoid a confrontation. How much of that sunk in. Is hard to say. A reasonable officer is doing his best. Under the circumstances. Trying to be polite. Trying to be calm. Trying to keep everybody separate. He asks her to go into the hallway. They could have had a conversation. Instead she darts back toward the lobby. The very place where he was trying to create safe distance. At that point. At that point he is suspecting her of disorderly conduct. He is reasonably believing. This is a hotel lobby. It is open 24 hours a day. This is a public place. It doesn't matter how many people are there. Let me ask you about that assertion. That it is undisputed. That the lobby is open 24-7. If that is so. Why the locked door? Why would there have been the need for the locked door. That Mr. Braham apparently knocked in. I mean. We don't know your honor. What we know is she went upstairs. Where she wasn't supposed to be. She may have locked the door before she went upstairs. We don't know why she locked the door. It is undisputed. Danielle Blackmore herself in her testimony. Acknowledged that the hotel policies. Require that lobby to be open 24-7. And open. Not only open. Open for business. And access from the outside. That I don't know. It is open for business. Open for business. You can interpret that however you like. That could be a distinction. With a difference. If open for business means. It is open for business for guests. Who are inside the building. That is different from open for business. Meaning that people can come in. From the outside. Right? It is a hotel. It is open to receive guests. I don't know whether that means. The door can't remain locked. But the point is. The Utah definition is expansive. It's list of examples. Of places. Including apartment houses. All of these places are private places. That have public common areas. This hotel lobby. Had a vending area. Had a business area. Had areas where. Either the guests could use. It was certainly an area where potential guests. Would come in and register. And be booked into the hotel. Let me ask you a question on that. Since you are on the statute. What the statute says. Public places include those. Where the public. Or a substantial group of the public. Has access.  That verb tense is important to me. Then we would say shops. Shops are one of the examples. Has access. And has access. Connotes to me. Is open for business. In other words you can't say. The dress shop down the street. You can go in there and buy a dress. At noon and so. Public has access at midnight. Has access. So the first question is. At that moment in time. Did the public have access. It's not a 24-7 sort of thing. By the words of the statute. For two reasons.  First of all. The hotel has 44 guest rooms. And a potential of 142 guests in it. Any of those guests. Have access at any time to the lobby. Beyond that. The hotel is open 24 hours a day. For business. It says the public. Not guests. Not 82 guests or however many guests. It says the public has access. That's all of Huracan. All of St. George. Salt Lake City. If they drive down there. Correct. Anyone could have shown up. The hotel is open 24 hours a day. For business. No it's not. The door is locked. Obviously these people need to sleep. They're not robots. And if you need to get in after hours. And you have a good reason to. Then there's a telephone number you call. And you wake them up. And they come down as the owners. And they take care of business. Or they tell you sorry. No rooms for us tonight. That's what happened that night. But that's not what the hotel policies required. The hotel policies are undisputed your honor. The hotel is open for business 24 hours a day. But beyond this what we're talking about. Is what a reasonable officer would have understood. In qualified immunity. An opposing counsel has failed. To show any case. That would demonstrate. That a hotel lobby. Is not a public place. Not a single case. This is a fact intensive inquiry. I just gave you the statutory verb tense. And a statute. Can be clearly established law. Can't it? Absolutely. And the statute. In my view at least your honor. Talks inclusively about. A host of different public places. Private places. That have a public common area. Such as an apartment house. Such as a business. This is a business. This is a business. And even if we decide that the business is private. If the private business has a public common area. Like a hotel lobby. Then it falls squarely. Within the definition of Utah statute. So the statute. Does not provide. Clearly established law. That this was not a public place. Nor does Gallegos. Gallegos does not concern a hotel lobby. In the context of a fourth amendment seizure. The supreme court said. That it has to be specific. Unless it's just clearly obvious. And that's what counsel is arguing about. With respect to love. But this is not a clearly obvious situation. Nor has counsel. Pointed to a case. Where there's a general principle. That can be applied with clarity. To this specific situation. Not a single case. In fact plaintiff did not even engage. That basis of the district courts ruling. With respect to. Especially with respect to the unlawful. The resistance. The video couldn't be clearer. Of showing someone resisting arrest. And therefore. And Daniel of course admitted it. Daniel admitted in her deposition. I asked why did you resist the officers. Attempts to handcuff you. And she said because it was my right. Counsel. Let me just interrupt. I'm sorry for a second here. I just want to clarify one point. On this public place. One way to read that statute. Which is not the way. The district court read it. Was to view this in categorical terms. In other words. Places that categorically. Are places where the public has access. As opposed to being concerned. With whether this specific entity. At that specific time. Was open to the public. And so what I would ask. In your knowledge. Is there any case in Utah. That focused on the categorical. Dimension of this statute. The answer. First of all. Is I completely agree. I think it's the only way to read the statute. As a categorical definition. Secondly I'm not aware of any case. In Utah that defines one way or the other. About hotel lobbies. I think every party in this case. Has exhaustively searched that issue. And has been unable to find anything. What we know is by way of category. That offices and apartment houses. And things similar to that. With public common areas. Are considered public. What about shops? Let me just ask you briefly. On the idea of the arrest. Opposing counsel said. That the officer had to let her know. That she was under arrest. As a matter of Utah law. Are you aware of any law. That would have required that. In those circumstances. No I'm not. But the more important thing. I think here is. When officer Carlson. Initially put handcuffs on her. He was not arresting her. He was detaining her. Under the suspicion of disorderly conduct. She immediately began to resist. At which point he said. Now you are under arrest. And he explained why. So it went from a detention. To an arrest. And the reason this is different from Cortez. Is Cortez was never the subject. Or never a suspect of a crime. It was a Terry stop. And she was fully cooperative. Here Danielle. Danielle was uncooperative from the get-go. Confrontational from the get-go. He tried everything he could. Stop, stop, stop. Calmly trying to de-escalate the situation. And she continued to resist. Counsel you are out of time. So please just finish your thought. Let me finish my thought here. Including by charging back into the lobby. At that point he had her in the alcove. Had she just again stopped. It would have been over. But she refused to stop. At that point he has reasonable suspicion. Of disorderly conduct. And moves in to put handcuffs on her. Again to just try to get the situation under control. That is what police officers have to do. They have to assume the worst. They have to keep the situation under control. She was out of control. He went to put handcuffs on her. Instead of complying. She resisted. She says she had the right to resist. Because it was an unlawful arrest. But we know that is not the case. All right counsel. Thank you very much for your argument. Mr. Rohn if you would add 1.20 to whatever the remaining time is. For the appellant. I would appreciate it. Okay. Thank you your honors. Just wait one second. Okay. Now please proceed. Okay. Thank you your honors. A couple of things. It is hard to show this. On page 5 of our brief. The top photo. You can see there. Mr. Brangham walking to the door. That door right here. Is at a right angle. That is the broken door. Supposed to be sliding. East and west. Looking north. So. That was the. Background of what happened there. What I heard in the last 15 minutes. Or 16 minutes here. Has been a lot of discussion. About contested issues of fact. You know. And that is why you have juries. To resolve these things. Now. I know that we have. You know. The requirement. To show. You know. Case law. Or obvious clarity. Under Graham. Here is what you said. Within the last six months. Officer Grasshorn. This is Leverson Grasshorn. Points out that we lack any binding precedence. On this issue. But a general rule. May apply with obvious clarity. Here the constitutional prohibition. Applies with obvious clarity. Based on common sense. Now you know. I think that is a very good way. To look at this. Common sense. You know. It is common sense. That this was not a public place. You cannot arrest someone. For disorderly conduct. It is common sense. That you cannot grab a woman. By the left breast. And push her against the wall. And not have her be upset about it. That is not resisting. And this is all common sense. And I think. Did the district court find. That he had grabbed her breast. Oh yeah. He actually showed it. I had it right here a minute ago. Where is that? Well I had his opinion here. You used the word chest. I am sorry your honor. The district court used the word chest. Yes. It is right here. On page of his. That is 159. I have it right here. If you look at. Document 159 page 20. There it is. That is not the question I asked you. The question I asked you. Is whether the court made a finding. He grabbed her breast. I don't recall any such finding. He did touch her at the area. At her chest area. When he stuck out his hand. That is a whole different thing. It seems to me. Than grabbing somebody's breast. If you don't have any basis for that. Then we are stuck with the facts. That the district court found. Your honor. I am looking at the picture he had in here. On page 18. Of the brief. Showing it. That picture is not a finding. It is not. But it is something that was relied upon. She says he grabbed my breast. But see. That is a factual determination. It should go before a jury. I think a jury would be very. Concerned about that. When they saw it. But I think. The thing I want to just close with here. Is. These are jury questions. This case. Should go to a jury. Of her peers. And let them decide these issues. All right. Can I answer any more questions? Counsel. The case is submitted. Thank you for your arguments. Thank you. Thank you your honors.